UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAZARO DESPAIGNE BORRERO,

Petitioner,

v.

CURTIS J. ALJETS, IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

Civil File No. 00-2351 (RHK/FLN)

**REPORT AND RECOMMENDATION**

Katherine M. Menendez, Assistant Federal Defender, Suite 107, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Petitioner.

Friedrich A.P. Siekert, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Respondent.

FRANKLIN L. NOEL, Chief Magistrate Judge

Petitioner commenced this action by filing an application for habeas corpus relief pursuant to 28 U.S.C. § 2241. He claims that he is being detained by the United States Immigration and Naturalization Service, (INS), in violation of his rights under federal law and the Constitution. This matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c).

For the reasons discussed below, we find that the statute by which Petitioner is being detained, as interpreted by the Supreme Court in Zadvydas v. Davis, 121 S.Ct. 2491 (2001), does not permit the INS to hold Petitioner in custody indefinitely. Given Zadvydas's construction of the governing statute, we find that Respondent has already held Petitioner longer than the law allows. It will therefore be recommended that Petitioner's application for habeas corpus relief be GRANTED.

FILED SEP 10 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## I. BACKGROUND

Petitioner is a Cuban alien who came to the United States in 1980 during the "Mariel Boatlift."[1] Like most other Mariel Boatlift Cubans, Petitioner was not granted legal admission to this country when he arrived here. Instead, he was allowed into the country on "parole," and he has always been (and still is) classified as a "parolee." See 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.12 ("Parole determinations and revocations respecting Mariel Cubans"). As a result, Petitioner is considered to be an "excludable" or "unadmitted" alien.[2] Thus, even though Petitioner has been physically present in this country for more than twenty years, he has the same legal status as a person stopped at the border while trying to enter the United States.

---

[1] A brief synopsis of the Mariel Boatlift can be found at Caballero v. United States, 145 F.Supp.2d 550, 552 (D.N.J. 2001).

[2] In Rosales-Garcia v. Holland, 238 F.3d 704 (6th Cir. 2001), pet. for cert. filed August 15, 2001 (No. 01-285), the Sixth Circuit Court of Appeals explained why some aliens, such as Petitioner, are still treated as inadmissible/excludable aliens, even after they have lived and worked in this country for many years.

> "Under the former version of the immigration act the government had two mechanisms for returning non-citizens to their country of origin: "exclusion" was the procedure used to refuse an alien entry at the border of this country; "deportation" was the procedure used to remove an alien who has already entered the country but is here illegally. See [Landon v.] Plasencia, 459 U.S. [21,] 25-26,... [(1982)]. Although exclusion proceedings usually occurred at the port of entry, the Supreme Court developed what has become known as the "entry fiction" to govern the rights of those aliens who are deemed excludable but who have nonetheless been allowed to enter physically the United States for humanitarian, administrative, or other reasons, under 8 U.S.C. § 1182(d)(5)(A). Under the entry fiction, an alien deemed to have entered this country illegally is treated as if detained or "excluded" at the border despite his physical presence in the United States."

Id. at 717.

The terms and conditions of Petitioner's initial parole into the United States are not readily apparent from the present record. At some point, however, he made his way to Minnesota. In 1983, he was convicted in the state district court for Ramsey County, Minnesota, on a charge of "simple robbery." He was sentenced to eighteen months in prison, but his sentence was stayed. In 1984, he was convicted for possession of cocaine, and was required to serve four months at the Ramsey County Workhouse. In 1987, he was convicted of theft. He again received an eighteen-month prison sentence, but his sentence again was stayed. Finally, in 1993, Petitioner was convicted in Ramsey County on four charges of possessing and selling cocaine and being a felon in possession of a pistol. For those offenses, he was sentenced to 122 months in state prison.

In 1998, while Petitioner was still serving his state prison sentence, the INS initiated removal proceedings against him because of his various criminal convictions. An Immigration Judge concluded that Petitioner was indeed removable, and that he should be returned to Cuba. Thereafter, Petitioner applied for relief under the "Convention Against Torture," but on August 2, 1999, the Immigration Judge denied Petitioner's application for relief under that Convention and ordered that he be removed to Cuba.[3]

Petitioner appealed the Immigration Judge's removal order, but the Board of Immigration Appeals, ("BIA"), dismissed the appeal.[4] Petitioner then sought further review

---

[3] Transcripts of the proceedings before the Immigration Judge, and a copy of the Immigration Judge's decision in Petitioner's case, are included in Respondent's return. (Declaration of Paul D. Kovac; Exhibit A, pp. 21-100; [Docket No. 12].)

[4] See Kovac Decl., Exhibit A, pp. 102-06.

in the Eighth Circuit Court of Appeals, but that appeal also was dismissed. It therefore appears that Petitioner has exhausted all legal means of challenging his removal order, and the order has become final.

While Petitioner was still in the process of appealing his removal order, his state prison term expired. Because of the removal order, however, Petitioner was not released from custody as scheduled. Instead, when he reached the end of his prison term on September 11, 2000, he was turned over to the INS. He has remained in INS custody ever since.[5]

Although the INS has determined that Petitioner should be removed from the United States to Cuba, that has not yet occurred, because Cuba will not accept him. As explained by Respondent, Petitioner "has a final order of removal to Cuba, but his repatriation cannot be effectuated immediately due to the current state of negotiations with Cuba concerning the return of many of its nationals presently detained in the United States and awaiting deportation pursuant to final orders of removal." ("Respondent's Response To Court's July 6, 2001 Request For Further Briefing," [Docket No. 26], p. 2.)[6] Thus, as matters presently

---

[5] The INS initially held Petitioner at the Minnesota Correctional Facility in Rush City, Minnesota. He was later transferred to the Hennepin County Jail, and then to the Sherburne County Jail, where he remains confined at this time.

[6] In Rosales-Garcia v. Holland, the Court provided the following summary of our government's efforts to repatriate Mariel Cubans to their homeland:

> "According to the affidavit of Michael E. Ranneberger, the Coordinator of the Office of Cuban Affairs in the State Department, who has been responsible for negotiations with Cuba since 1995, '[f]or almost two decades, the United States has been discussing with Cuban authorities the issue of return of excludable Cubans.'... The United States reached a limited agreement with Cuba to repatriate Mariel Cubans in December 1984. Under the terms of this agreement, Cuba consented to the return of 2,746 excludable aliens from the

stand, Petitioner appears to be facing indefinite detention by the INS.

As a Mariel Boatlift Cuban, Petitioner is entitled to an annual review of his continuing post-removal detention, pursuant to the "Cuban Review Plan" set forth at 8 C.F.R. § 212.12. If the INS should ever find that Petitioner is suitable for release, he could be freed from confinement, subject to whatever terms and conditions the INS might deem appropriate. To date, however, the INS has declined to release Petitioner under the Cuban Review Plan, and Respondent does not suggest that Petitioner is likely to gain his freedom any time soon.

It is the prospect of indefinite detention that caused Petitioner to file his present habeas corpus petition.[7] He is not currently challenging the validity of his removal order,

---

> Mariel Boatlift, at the rate of 100 per month, whom the INS was able to identify at the time the agreement was reached.... Cuba suspended the agreement in May 1985, but agreed to reinstate the agreement in November 1987.... As of January 1999, 1400 Cubans had been returned to Cuba.... [¶] Further talks between the two countries took place on September 9, 1994 and May 2, 1995.... The September 1994 agreement stated that the United States and Cuba 'agreed to continue to discuss the return of Cuban nationals excludable from the United States.'... Ranneberger noted that discussions between the two countries continued periodically, and while he cannot offer details from these sensitive discussions, he says that he 'can confirm that the return of Cuban nationals ... remains under discussion between the two governments.' [¶] The United States is currently detaining approximately 1,750 Mariel Cubans in U.S. prison facilities who are neither eligible for parole nor deportable because Cuba will not accept them.... According to the government, the United States' position has been and currently is that Cuba is required to take back all of its nationals who are denied admission to the United States."

Id. at 711 (citations omitted).

[7] Respondent does not suggest that Petitioner is barred in any way from seeking habeas corpus relief, and Zadvydas clearly indicates that his current petition can properly be entertained in federal district court. 121 S.Ct. at 2497-98.

but rather, he is challenging the INS's authority to keep him incarcerated until Cuba agrees to take him back – regardless of how long it might take for that to occur.

Respondent contends that the INS can detain Petitioner indefinitely pursuant to 8 U.S.C. § 1231(a)(6), which provides that –

> "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

The "removal period" referred to in § 1231(a)(6) is a 90-day period following the entry of a removal order. 28 U.S.C. § 1231(a)(1).[8] Paragraph (3) of § 1231(a), (referred

---

[8] 28 U.S.C. § 1231(a)(1) defines the "removal period" as follows:

> "(A) In general. Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").
>
> (B) Beginning of period. The removal period begins on the latest of the following:
>
> > **(i)** The date the order of removal becomes administratively final.
> > **(ii)** If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
> > **(iii)** If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.
>
> (C) Suspension of period. The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."

to at the end of § 1231(a)(6)), directs the INS to impose certain terms and conditions of release for aliens who are subject to removal orders, but have not yet been removed by the end of the 90-day removal period.[9]

After carefully examining § 1231(a)(6) in Zadvydas v. Davis,121 S.Ct. 2491 (2001), the Supreme Court concluded that § 1231(a)(6) does not permit the INS to hold legally admitted aliens in custody indefinitely. Zadvydas confirms that a legally admitted alien can always be detained during the 90-day "removal period" contemplated by the statute. But after that, the Court held, the alien can be held for only a "reasonable period," which is presumed to be six months, unless the INS can show that there is a "significant likelihood of removal in the reasonably foreseeable future." Id. at 2504-05.

Zadvydas was not decided until June 28, 2001, which was after all of the initial briefing in this case had been completed. Recognizing that Zadvydas could affect the outcome of this case, we appointed counsel to represent Petitioner, and solicited further briefing from both parties. (See Orders dated July 5, 2001, and July 17, 2001; [Docket

---

[9] Paragraph (3) of 1231(a) states that –

"If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien --

(A) to appear before an immigration officer periodically for identification;
(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;
(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and
(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien."

Nos. 16 and 18].) Supplemental briefs were received from both sides on August 7, 2001, (Docket Nos. 25 and 26), and on August 15, 2001, the Court heard oral argument from counsel on the significance of Zadvydas.

## II. ISSUE PRESENTED

Petitioner contends that Zadvydas clearly validates his habeas corpus petition. He argues that he has already been held for more than six months past the end of the 90-day removal period, and that there is no significant likelihood of removal in the reasonably foreseeable future. He therefore concludes that the INS must release him immediately.

Respondent, on the other hand, contends that Zadvydas is irrelevant, because it applies only to aliens who have gained admission to the United States. Respondent stresses that Petitioner does not have the same legal status as the aliens in Zadvydas, because he is still an "excludable" alien who was merely "paroled" into this country. From a purely legal standpoint, he has never actually gained admission to this country. (See footnote 2, supra, and accompanying text.) According to Respondent, "the Supreme Court's decision in Zadvydas does not apply [here] because [Petitioner] is an excludable alien who never formally entered this country and the Supreme Court limited Zadvydas to detained aliens who had lawful permanent resident status." ("Respondent's Response to Court's July 6, 2001 Request For Further Briefing," [Docket No. 26], p. 2.)

Thus, the critical issue to be resolved in this case is whether the Zadvydas interpretation of § 1231(a)(6) applies only to aliens who have gained admission to the United States, or whether it also applies to unadmitted/paroled aliens, such as Petitioner. We conclude that the statute, as construed by Zadvydas, applies to both categories of aliens.

## II. DISCUSSION

### A. Zadvydas v. Davis

In Zadvydas, the Supreme Court reviewed the habeas claims of two legally admitted aliens, Kestutis Zadvydas and Kim Ho Ma, who were detained by the INS. The INS had entered removal orders against both of the petitioners directing them to leave the United States, but no country would accept them.[10] Thus, both of the habeas petitioners in Zadvydas, like Petitioner here, were facing the prospect of indefinite INS detention.

The government argued in Zadvydas that § 1231(a)(6) authorizes the INS to detain a removable alien indefinitely, if no other country will accept him. Zadvydas and Ma argued that indefinite INS detention violated their constitutional due process rights. Thus, the Supreme Court had to decide "whether this post-removal-period statute, § 1231(a)(6), authorizes the Attorney General to detain a removable alien indefinitely beyond the [90-day] removal period or only for a period reasonably necessary to secure the alien's removal." 121 S.Ct. at 2495 (emphasis in the original). By a five-to-four vote, the Court concluded that § 1231(a)(6) does not authorize indefinite INS detention.

In Zadvydas the Court concluded that

> "A statute permitting indefinite detention of an alien would raise a serious constitutional problem."

121 S.Ct. at 2498.

To avoid addressing this "serious constitutional problem," the Court invoked a

---

[10] Petitioner Zadvydas had been born in a German refugee camp to Lithuanian parents. He was not a citizen of either Germany or Lithuania, and neither country would accept him after the INS ordered that he be removed. The other petitioner, Ma, was born in Cambodia and came to the United States via Thailand and the Philippines. Apparently, neither Cambodia, nor any other country, would accept Ma following his removal order.

"'cardinal principle' of statutory interpretation:"

> "when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"

121 S.Ct. at 2498, quoting Crowell v. Benson, 285 U.S. 22, 62 (1932).

After explaining its serious doubts about the constitutionality of indefinite INS detention of removable aliens, the Supreme Court, as a matter of statutory construction, concluded that the Act simply does not permit indefinite INS detention of removable aliens. The Court concluded there is no "clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed." 121 S.Ct. at 2502. "We have found nothing in the history of these statutes," the Court wrote, "that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention." Id. at 2503.

As construed by the Court in Zadvydas, § 1231(a)(6) gives the INS only limited authority to detain removable aliens after the 90-day removal period. "[I]nterpreting the statute to avoid a serious constitutional threat," the Court determined that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by the statute." Id. In other words,

> "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention."

Id. at 2498 (emphasis added). "[I]f removal is not reasonably foreseeable," a federal court reviewing an alien's habeas corpus petition, "should hold continued detention unreasonable and no longer authorized by statute." Id. at 2504 (emphasis added).

Finally, the Court in Zadvydas found it to be "practically necessary to recognize some presumptively reasonable period of detention" (set by the Court at six months) after the expiration of the 90-day removal period. Id. As interpreted by the Supreme Court in Zadvydas, §1231(a)(6) authorizes the INS to detain aliens for six months after the expiration of the 90-day removal period. However, "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id. If the INS cannot show that there is a "significant likelihood" that the alien will actually be removed from the country within "the reasonably foreseeable future," then the INS no longer has the statutory authority to hold the alien in custody.[11]

Having determined that § 1231(a)(6), as construed, does not authorize indefinite detention of aliens, the Court found it unnecessary to decide whether, or under what circumstances, such detention would be permitted by the Constitution.

B. Application of Zadvydas

When discussing the constitutional issue it sought to avoid, the Court was careful to draw a distinction between removable aliens, like Zadvydas, and excludable/inadmissible aliens, like petitioner here. The distinction was important because the Court held, nearly 50 years ago, that the Constitution did permit the indefinite detention of excludable/inadmissible aliens. Shaughnessy v. United States, ex rel. Mezei, 345 U.S.

---

[11] This does not necessarily mean that the alien must be turned loose, free of all constraints. The Supreme Court specifically approved the supervised release provisions of § 1231(a)(3). 121 S.Ct. at 2501 ("we nowhere deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions").

206 (1953). It is this distinction which sets up the question we must now decide: Does § 1231(a)(6) authorize the indefinite detention of inadmissible/excludable aliens such as Petitioner, even though it is now clear, after Zadvydas, that the statute does not authorize indefinite detention of other removable aliens? In other words, does the statute mean one thing when it is applied to one category of aliens, but something else when applied to a different category? We think not.

The statute itself clearly indicates, on its face, that it is equally applicable to both inadmissible/excludable aliens and to otherwise removable aliens. The statute expressly refers to "an alien ordered removed who is inadmissible under section 1182 of this title," as well as aliens who are "removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title." (Emphasis added.) Moreover, Zadvydas confirms that § 1231(a)(6) applies to inadmissible aliens as well as removable aliens. 121 S.Ct. at 2498 ("[t]he post-removal-period detention statute applies to certain categories of aliens who have been ordered removed," including "inadmissible aliens").

Justice Kennedy's dissent in Zadvydas makes this point even more clearly:

> "Section 1231(a)(6) permits continued detention not only of removable aliens but also of inadmissible aliens, for instance those stopped at the border before entry. Congress provides for detention of both categories within the same statutory grant of authority."

121 S.Ct. at 2509 (emphasis added).

Justice Kennedy also pointed out that --

> "it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility."

Id. at 2510. We agree. Section 1231(a)(6), on its face, does not distinguish unadmitted aliens from other removable aliens.

In short, we can find no sound reason to interpret and apply the statute one way for one category of aliens, but a different way for others. We therefore must conclude that § 1231(a)(6), as construed in Zadvydas, does not authorize the INS to detain Petitioner indefinitely.

Justice Kennedy's dissent accurately predicts the conclusion reached here.

> "This result – that Mariel Cubans and other illegal, inadmissible aliens will be released notwithstanding their criminal history and obvious flight risk – would seem a necessary consequence of the majority's construction of the statute."

Id. at 2513. What Justice Kennedy is obviously saying is that there is no principled basis for not applying the majority's interpretation of § 1231(a)(6) to Mariel Cubans such as Petitioner. Again, we agree.

C. Mezei

In Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953), the Supreme Court rejected the constitutional claims of an inadmissible alien named Ignatz Mezei who was facing indefinite INS confinement after being stopped at Ellis Island while attempting to enter the United States.[12] In light of the Supreme Court's decision in Zadvydas, there is nothing in Mezei which compels this Court to give §1231(a)(6) a different construction when it is applied to excludable/inadmissible aliens. Mezei provides no support for Respondent's position that § 1231(a)(6), as interpreted in Zadvydas, should apply one way to unadmitted aliens, but differently to other removable aliens covered by the statute. Mezei certainly indicates that indefinite detention of unadmitted aliens may be permissible under

[12] Actually, the alien in Mezei was attempting to re-enter the country. He had lived here for approximately twenty-five years before traveling to Rumania to visit his dying mother. When he tried to return to the United States, he was stopped at the border and subjected to indefinite detention. 345 U.S. at 208-09.

the Constitution. Mezei, however, says nothing about the statutory construction of §1231(a)(6). Zadvydas makes it clear that, regardless of what the Constitution may permit, the statute, as construed, has not authorized the INS to detain aliens indefinitely. Again, Zadvydas holds that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by the statute." 121 S.Ct. at 2503 (emphasis added).[13]

Likewise, there is nothing in Zadvydas to support Respondent's contention that the statute means one thing when applied to removable aliens, but something else when applied to excludable/inadmissible aliens. Although the Court in Zadvydas relied upon the distinction between removable aliens and excludable/inadmissible aliens to avoid overruling Mezei, the opinion doesn't tell us what the Court would do if it was compelled to apply the same statute it construed in Zadvydas to the class of alien covered by Mezei.[14]

---

[13] In the pre-Zadvydas case of Rosales-Garcia v. Holland, the Sixth Circuit decided that, notwithstanding Mezei, Mariel Cubans can properly oppose indefinite INS detention on constitutional (due process) grounds. Noting that Mezei arose during the Korean War, when "our nation labored under a fear of Communist infiltration and in a state of affairs defined as a national emergency," (238 F.3d at 720), the Court concluded that in the post-cold war era Mezei should no longer be viewed as an impenetrable barrier to due process claims raised by excludable aliens. Id. at 721 ("we emphasize that aliens – even excludable aliens – are 'persons' entitled to the Constitution's most basic protections and strictures"). Given our understanding of Zadvydas, we find no need to decide whether Mariel Cubans can oppose indefinite INS detention on purely constitutional grounds. It is nevertheless worth noting that, according to Rosales-Garcia, the Constitution does not permit the INS to hold Mariel Cubans indefinitely. But see, Caballero v. United States, 145 F.Supp.2d 550 (D.N.J. 2001) (concluding that Mezei is still fully viable, and substantially limits the constitutional rights that can be asserted by Mariel Cubans).

[14] Indeed, so anxious was the Zadvydas Court to avoid the "serious" and "obvious" 121 S.Ct. at 2500, constitutional question presented by indefinite and potentially permanent detention, that it adopted what can only charitably be called a "strained" construction of the statute. A more straight forward and arguably constitutional construction of the statute would have simply extended the holding of Mezei to removable aliens, as urged by the government.

D. 8 U.S.C. § 1182(d)(5)(A)

Respondent further contends that Petitioner can be treated differently from aliens who gained admission but were ordered removed, because he is subject to the parole provisions (and parole revocation provisions) of 8 U.S.C. § 1182(d)(5)(A). Under that statute –

> "The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

This statute gives the INS the authority to grant admission by parole to otherwise inadmissible aliens, to revoke the parole of such aliens, to take such aliens back into custody when there has been a parole revocation, and to thereafter continue its efforts to remove such aliens from the country. However, we find nothing in § 1182(d)(5)(A) itself that gives the INS the authority to keep inadmissible aliens incarcerated indefinitely, pending ultimate removal from the country.

The authority to detain an inadmissible alien who has been ordered to be removed, such as Petitioner here, is found in § 1231(a)(6), not in § 1182(d)(5)(A). Indeed, Respondent expressly acknowledges that Petitioner's "detention by the INS is governed by 8 U.S.C. § 1231." ("Respondent's Memorandum In Opposition To Petition For Writ of Habeas Corpus [etc.]," [Docket No. 11], p. 14.)

Although Mezei held that indefinite detention of excludable/inadmissible aliens does

not violate the Constitution, and although the Supreme Court in Zadvydas expressly declined to overrule Mezei, there is nothing in the language of § 1182(d)(5)(A) that would indicate that the post-removal-period detention statute should be applied differently when it is applied to parole-revoked aliens rather than other types of removable aliens. Therefore, § 1182(d)(5)(A) does not allow Respondent to avoid the Zadvydas interpretation of § 1231(a)(6). Put differently, just because indefinite detention of excludable/inadmissible aliens may be constitutional, does not mean the court is compelled to construe the statute to permit indefinite detention. As the Court in Zadvydas has concluded that Congress did not intend §1231 to permit indefinite detention of removable aliens, this Court concludes the statute must be given the same construction when it is applied to excludable/inadmissible aliens.

**IV. CONCLUSION**

This Court concludes that § 1231(a)(6), as interpreted in Zadvydas, does not authorize the INS to detain Petitioner indefinitely. According to Zadvydas, § 1231(a)(6) authorizes the INS to detain aliens -- including unadmitted aliens like Petitioner -- for only a reasonable period of time, (presumed to be six months), after the 90-day removal period. Regardless of what the Constitution might permit, that is all the statute authorizes.

In this case, Petitioner's 90-day removal period began on September 11, 2000,[15]

---

[15] Ordinarily, the 90-day removal period begins on the date when "the order of removal becomes administratively final." 8 U.S.C. § 1231(a)(1)(B)(i). The removal period will begin later, however, if (a) there is a court appeal and the court imposes a stay of removal, or (b) the alien is imprisoned when the removal order is entered. Section 1231(a)(1)(B)(ii) and (iii). (See footnote 8, supra.) In this case, it appears that Petitioner's removal order became "administratively final" on February 3, 2000, when the BIA rejected his appeal of the Immigration Judge's removal order. However, Petitioner was still serving his state criminal sentence at that time, so the 90-day removal period did not begin in this

and ended 90 days later on December 10, 2000. It has now been more than six months since the 90-day removal period ended, which means that the presumptively reasonable period of time for effecting Petitioner's removal has expired. Yet Petitioner is still in INS custody today, and, more significantly, he is still facing indefinite detention.

Petitioner's status as a Mariel Cuban provides "good reason to believe that there is no significant likelihood" that his removal order will be carried out "in the reasonably foreseeable future." Zadvydas, 121 S.Ct. at 2505. To date, Respondent has offered no evidence to the contrary. If Respondent wishes to submit evidence showing that, in fact, there is a significant likelihood that Petitioner actually will be removed from this country in the reasonably foreseeable future, such evidence must be submitted within the next ten days. If no such evidence is filed by that deadline, then Petitioner's application for a writ of habeas corpus should be granted.

Lastly, it should be noted that a writ of habeas corpus will not make Petitioner a truly free man by any means. The INS can still impose terms and conditions of release upon him, and can still take him back into custody if he violates those terms and conditions. See 8 U.S.C. § 1231(a)(3) (quoted at footnote 9, supra); Zadvydas, 121 S.Ct. at 2501. In addition, it appears that Petitioner is still subject to whatever conditions of supervised release may attend his state criminal convictions and sentence. And, of course, Petitioner is still subject to removal from the United States whenever the government can find some place to send him.

---

case until September 11, 2000 – the date when Petitioner completed his state prison term and was turned over to the INS.

## V. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's application for a writ of habeas corpus, (Docket No. 1), be GRANTED, unless, within ten days after the date hereof, Respondent submits evidence demonstrating that there is a significant likelihood that Petitioner actually will be removed from the United States in the reasonably foreseeable future; and

2. Upon entry of an order granting the writ of habeas corpus, Petitioner shall be released from physical custody, subject to such terms and conditions as the INS deems appropriate.

DATED: September 10, 2001

FRANKLIN L. NOEL
Chief Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.